## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

STEPHEN M. NELSON (01),

      Defendant.

Case No. 19-20059-01-DDC

### MEMORANDUM AND ORDER

This matter comes before the court on defendant Stephen M. Nelson's Amended Motion to Suppress Evidence (Doc. 43). The government responded to Mr. Nelson's Amended Motion (Doc. 47) and incorporated its Response (Doc. 35) to Mr. Nelson's initial Motion to Suppress.[1] The court conducted an evidentiary hearing on September 1, 2020. Doc. 48. After the hearing, Mr. Nelson submitted Additional Briefing in Support of Motion to Suppress Evidence (Doc. 49) and the government responded with Additional Briefing in Response to Defendant's Motion to Suppress Evidence (Doc. 50). After considering the evidence and the parties' submissions, the court denies Mr. Nelson's motion. This Order explains why.

Mr. Nelson's Amended Motion to Suppress Evidence asks the court to suppress evidence collected from a search conducted at 1847 N. 19th Street, Kansas City, Kansas (the "19th Street Address") and evidence collected by law enforcement after the February 1, 2019 search of the 19th Street Address, including: (1) Mr. Nelson's statements to law enforcement during an interview on February 1, 2019, (2) evidence seized after Mr. Nelson's arrest on July 23, 2019,

---

[1] Mr. Nelson first filed a Motion to Suppress (Doc. 29) on March 9, 2020. The court later granted Mr. Nelson leave to file his Amended Motion to Suppress Evidence, Doc. 42, and its filing rendered his initial motion moot. Doc. 44.

based on an arrest warrant after Mr. Nelson failed to appear on state court charges filed after the February 1, 2019 search, and (3) Mr. Nelson's statements after his July 23, 2019 arrest.  Doc. 43 at 3–4.

Mr. Nelson makes two principal arguments.  *First*, he argues the affidavit given in support of the search warrant application was defective and failed to establish probable cause. Doc. 43 at 5–10.  Mr. Nelson argues the court should not consider the evidence collected from a trash pull at the 19th Street Address to establish probable cause because the officers committed a physical trespass when they pulled the trash.  *See id.* at 10–11.  And, Mr. Nelson argues the other facts alleged in the affidavit do not establish probable cause.  *Second*, Mr. Nelson argues Detective Blackman violated Fed. R. Crim. P. 41(b) when he applied for a search warrant from a Wyandotte County, Kansas District Court Judge rather than asking a federal magistrate judge to issue one.  *Id.* at 11–14.

"On a motion to suppress, the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion."  *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020) (first citing *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007); then citing *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004)).  "The defendant has the burden of showing the Fourth Amendment was implicated, while the government has the burden of proving its warrantless actions were justified."  *Id.* (first citing *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); then citing *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010)).  "Generally, if the search or seizure was pursuant to a warrant, the defendant has the burden of proof."  *Carhee*, 27 F.3d at 1496 (citation and internal quotation marks omitted).  The actions challenged here consist of both warrantless

actions—the trash pull—and a search conducted on a court-issued search warrant.  The government thus bears the burden to justify the trash pull.  But, the defendant bears the burden to prove the unreasonableness of the warrant-based search of the 19th Street Address.

## I.     Background and Controlling Facts

The court held an evidentiary hearing on September 1, 2020, and unless otherwise noted, makes the following factual findings from the evidence presented on that date:

Jakob Blackman, a detective with the Kansas City Kansas Police Department ("KCKPD"), became a Task Force Officer ("TFO") with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") in August 2018.  Detective Blackman's dual roles allowed him to work on both state and federal investigations and cases.

In November 2018, Detective Blackman was contacted by a confidential informant ("CI") working with ATF.  The CI told Detective Blackman he had observed an individual known as "Pablo" in the 19th and Wood area in Kansas City, Kansas.  According to this CI, Pablo was selling narcotics and firearms.  The CI said he had observed Pablo—later identified as defendant Stephen Nelson—with a firearm.

On November 8, 2018, Officer Dillon Passinese with the KCKPD Narcotics Unit conducted a traffic stop of Heather Bowles after she left the 19th Street Address.  Officers found a syringe filled with suspected heroin in Ms. Bowles's vehicle.  Ms. Bowles then agreed to participate in an interview where she stated she could purchase heroin and methamphetamine from Pablo.  Ms. Bowles stated she could purchase narcotics from Pablo in the area near 19th Street and Wood—the same area and person described by the first CI.  Ms. Bowles admitted to leaving Pablo's house right before officers had stopped her.

Then, in early December 2018, Drug Enforcement Administration ("DEA") special agent Tyler Mansfield and KCKPD Officer Passinese met with a second confidential source ("CS #2"). CS #2 worked both with the DEA and KCKPD.  CS #2 informed Agent Mansfield and Officer Passinese that Stephen Nelson sold heroin and methamphetamine in ounce quantities and that Mr. Nelson also had several firearms for sale.  CS #2 told the officers that Mr. Nelson lived at the 19th Street Address and CS #2 provided Stephen Nelson's phone number.  Several days later, CS #2 recorded a phone call to Mr. Nelson where Mr. Nelson agreed to complete a methamphetamine purchase at a later date.  CS #2 also received pictures from the same phone number showing firearms "possibly for sale."  Gov. Ex. 1A at 2.

In mid-January 2019, the initial CI reported to Detective Blackman that he had seen Mr. Nelson outside the 19th Street Address with what he believed was a large bag of methamphetamine.

In sum, three separate individuals informed law enforcement of criminal activity pointing to the 19th Street Address and Pablo—later identified as Stephen Nelson.  After receiving this information, law enforcement decided to conduct surveillance at the 19th Street Address.  The KCKPD and the DEA installed a pole camera placed across the street.  Detective Blackman and Officer Passinese could access the footage from this pole camera.  It is unclear whether the DEA could access the video footage.

During surveillance on January 25, 2019, multiple vehicles arrived at the 19th Street Address throughout the day.  All of them stayed at the 19th Street Address for a short time. More specifically:

- At 1:52 p.m., a silver car and a white Ford Mustang arrived at the 19th Street Address and parked.  Two people exited the residence and one of them got inside the Ford

Mustang.  The other person entered the silver car.  The two vehicles stayed for about 20 minutes before leaving, departing around 2:12 p.m.

- At 3:49 p.m., a dark blue sedan parked south of the 19th Street Address and a man exited that vehicle and approached the address.  The man is not seen exiting the residence but the vehicle he had arrived in departed from the address at 4:01 p.m.  The vehicle stayed at 19th Street for just 12 minutes.

- Around 5:06 p.m., a white Ford SUV arrived at the 19th Street Address and then left six minutes later at 5:12 p.m.  The passenger from this SUV appeared to get out of the vehicle a little farther down 19th Street and entered another vehicle before leaving the surveilled area.

- At 6:18 p.m., a car arrived, parked, the driver entered the house at the 19th Street Address, and then left the residence two minutes later at 6:20 p.m.

- At 6:56 p.m., a white Dodge Neon arrived, parked, and its passenger approached the driver's side of a white pick-up truck parked near the 19th Street Address.  Then at 6:59 p.m., the passenger returned to the white Dodge Neon and departed.  In sum, the White Dodge Neon's visit to the 19th Street Address lasted four minutes.

- And then, at 7:13 p.m., a four door sedan arrived at the 19th Street Address, a passenger left the car, entered the house, and then returned to the sedan at 7:22 p.m.  The sedan stayed at the 19th Street Address for 10 minutes.  KCKPD officers tried to stop the sedan after it failed to yield but pursuit ended when the vehicle entered Missouri.

In total, seven cars came to the 19th Street Address on January 25, 2019.  None remained there longer than 20 minutes.

Video surveillance continued on January 28, 2019.  That day:

- At 8:17 a.m., a silver Chevy SUV arrived at the 19th Street Address.  A woman exited the SUV, appeared to enter the house, and then exited the house and returned to the SUV.  The SUV departed at 8:25 a.m., eight minutes after arriving.

- At 9:06 a.m., two individuals arrived in a white two door sedan.  A woman exited the vehicle, approached the house at the 19th Street Address and then appeared to return to the vehicle carrying a red bag.  The sedan departed at 9:10 a.m., four minutes after arriving.

In Detective Blackman's experience, high traffic and short stays at a residence may indicate narcotics trafficking.  After observing cars (and their occupants) arrive and leave the house after short periods of time, law enforcement officers decided to conduct a "trash pull" at the 19th Street Address.  A trash pull typically involves law enforcement officers, working undercover as trash collectors, collecting trash stacked for collection, near a public street.

The next day, on Tuesday, January 29, 2019, officers from the KCKPD, ATF, and the DEA conducted a trash pull at the 19th Street Address.  According to Detective Fincher with the KCKPD and a TFO with ATF, Deffenbaugh Waste Management normally picked up trash from the 19th Street Address on Tuesdays between 7:00 a.m. and 5:00 p.m.  So, Detective Fincher contacted ATF's contact within Deffenbaugh to arrange for Detective Fincher to ride along and make a trash pull on that Tuesday.  On the morning of the trash pull, Detective Fincher wore a reflective vest and rode along in a Deffenbaugh trash truck.  A Deffenbaugh employee drove the truck to the 19th Street Address.  For clarity, this Order refers to the trash truck that Detective Fincher occupied as "Trash Truck #1."

As Trash Truck #1 arrived at the 19th Street Address, Detective Fincher saw another Deffenbaugh trash truck pull up to that address.  For clarity, this Order calls this other trash truck

"Trash Truck #2." Trash Truck #2 was on its regular Tuesday route. Detective Fincher saw two Deffenbaugh employees from Trash Truck #2 collect two trash bags from the 19th Street Address and place them in the rear hopper of Trash Truck #2. Trash Truck #1 pulled up behind Trash Truck #2 and the driver of Trash Truck #1 stepped out of that truck and directed the Deffenbaugh employees from Trash Truck #2 not to collect any more of the trash stacked for removal from the 19th Street Address. Then, the driver of Trash Truck #1 removed the two trash bags already collected from the 19th Street Address and placed them in the rear hopper of Trash Truck #1. Detective Fincher, sitting in the passenger seat of Trash Truck #1, had an unobstructed view of these events. Also, Detective Fincher could see the distinctive greenish color of the two trash bags that originally were placed in Trash Truck #2. After this brief interaction, Trash Truck #2 went ahead to the other houses on 19th Street, regular Tuesday route. Detective Fincher and Trash Truck #1's driver collected the rest of the trash stacked for removal at the 19th Street Address and placed it in the hopper of Trash Truck #1. When they finished, the only trash in Trash Truck #1's hopper was trash collected from the 19th Street Address. With all the trash removed from the 19th Street Address, Trash Truck #1 travelled to a designated location and met Detective Blackman, who was driving a pickup truck. The officers removed the trash from the hopper of Trash Truck #1, *i.e.*, the trash collected from the 19th Street Address, and placed it in the bed of Detective Blackman's pickup truck.

Detective Blackman drove the 19th Street Address's trash bags to the KCKPD headquarters where officers from the KCKPD, ATF, and DEA agents sorted through the trash. Law enforcement officers found a Sig Sauer .9MM extended magazine package in the 19th Street Address's trash. The trash pull also revealed about 30 baggies tied in a way narcotics bags often are tied, with various residue colors inside the bags. Two bags had a blackish tar residue,

consistent with black tar heroin.  Other bags had a green residue, consistent with marijuana.  A test of one of those bags produced a presumptive positive for marijuana.  Law enforcement also found numerous packages of cigar and cigarillo packages.  In Detective Blackman's experience, drug users often empty tobacco from cigars and cigarillos and insert marijuana in its place.

Later that same day, after the trash pull and review, Detective Blackman applied for a state search warrant in Wyandotte County, Kansas District Court on January 29, 2019.  His application sought a warrant to search the 19th Street Address, an address in Wyandotte County, Kansas.

Detective Blackman's affidavit included the information provided by the two informants and Ms. Bowles about suspected illegal activity at the 19th Street Address.  The affidavit reported that surveillance of the 19th Street Address showed a pattern of short stay visitors consistent with narcotics sales, and that the trash pull had revealed evidence of narcotics sales and firearms.  Detective Blackman's affidavit also testified that "Pablo" was identified as the defendant in this case, Stephen Nelson, and he previously had been convicted of Distribution of a Controlled Substance and sentenced to 18 months in prison.  This conviction, the affidavit reported, would make it illegal for Mr. Nelson to possess a firearm.  Detective Blackman informed the Wyandotte County District Court Judge that he believed a search of the address would reveal evidence of Criminal Possession of a Firearm and Distribution and Possession of a Controlled Substance—crimes under Kansas state law.  When Detective Blackman applied for the warrant from the Wyandotte County District Court Judge, he believed the case was more likely to be adopted by the Wyandotte County District Attorney as a state court prosecution.  The Wyandotte County District Court Judge issued the requested warrant, a "No Knock" search warrant.

On February 1, 2019, the KCKPD Special Operations Unit ("SOU") served the search warrant on the 19th Street Address.  After the KCKPD SOU had secured the residence, ATF agents, Detective Fincher, DEA Agent Mansfield, and Detective Blackman searched the address.  ATF agents processed the scene, took photographs, documented the evidence, collected, and took the evidence to ATF's vault for security.  All of the incident supplement reports prepared by the officers from KCKPD's SOU, save for one, reported that KCKPD's SOU had served the search warrant for ATF.  *See* Def. Exs. 7–11.

The search of the 19th Street Address on February 1, 2019, found several guns and suspected narcotics, including:

- A Remington Shotgun
- Braztech .22 Caliber Rifle
- An SCCY Pistol with magazine and ammunition
- Kel-Tec PLR-16 Pistol with magazine and ammunition
- Kel-Tec PMR-30
- Sig Sauer P226 9mm Pistol
- Sig Sauer P238
- Miscellaneous ammunition
- Suspected marijuana
- Suspected methamphetamine
- Suspected cocaine
- Four digital scales
- Numerous glass pipes

Gov. Ex. 1B at 3–5.  After searching the 19th Street Address, Detective Blackman and Detective Fincher interviewed Mr. Nelson at the KCKPD Narcotics Unit.  Detective Blackman wrote his interview report on an ATF form.  Then, Detective Fincher applied for a state court DNA search warrant for Mr. Nelson to use in prosecuting him for criminal possession of a firearm.

The Wyandotte County District Attorney's Office adopted the case and charged Mr. Nelson with criminal possession of a firearm based on the February 1, 2019 search of the 19th Street Address.  The evidentiary record in this case doesn't establish the status of these state

charges.  But, according to records in the District Court of Wyandotte County, Kansas the

Wyandotte County District Attorney's Office filed state court charges against Mr. Nelson on

February 4, 2019. [2]  A federal arrest warrant was issued for Mr. Nelson on September 3, 2019

and the Wyandotte County District Attorney's Office dismissed the state court charges against

Mr. Nelson that same day.  The indictment charging Mr. Nelson in this federal case was returned

on September 25, 2019, almost eight months after the search of the 19th Street Address.

## II.        Probable Cause for the Search Warrant

Mr. Nelson argues the court should suppress the fruits of the search from the 19th Street

Address for two related reasons.  *First*, he argues the evidence collected from the trash pull at the

19th Street Address violated his Fourth Amendment rights.  Doc. 43 at 14–15.  And so, he

contends, the court must exclude the trash pull evidence from the probable cause determination

for the search warrant because the evidence was collected illegally.  *Id.  Second*, without the

trash pull evidence, Mr. Nelson argues that the remaining information in the affidavit for the

search warrant "does not rise to the level of probable cause."  *Id.* at 15.

The Supreme Court "repeatedly [has] said that after-the-fact scrutiny by courts of the

sufficiency of an affidavit should not take the form of *de novo* review.  A magistrate's

determination of probable cause should be paid great deference by reviewing courts."  *Illinois v.

Gates*, 462 U.S. 213, 236 (1983) (internal quotation and citations omitted).  The Court reaffirmed

"the traditional standard for review of an issuing magistrate's probable cause determination has

been that so long as the magistrate had a substantial basis for concluding that a search would

---

[2]        The court properly may take judicial notice of the state criminal proceedings against Mr. Nelson
in Wyandotte County District Court, *Kansas v. Nelson*, 2019-CR-000114.  *See Van Woudenberg ex rel.
Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000) ("[T]he court is permitted to take judicial notice of its
own files and records, as well as facts which are a matter of public record.") (citing *St. Louis Baptist
Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979)), *abrogated on other grounds by McGregor
v. Gibson*, 248 F.3d 946 (10th Cir. 2001).

uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.* (citations, internal quotations, and text alterations omitted).

"The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). "[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Id.* (internal quotations and citations omitted). When "determining whether a search warrant is supported by probable cause, this court reviews the sufficiency of the affidavit upon which a warrant is issued by looking at the totality of the circumstances and simply ensuring that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Cooper*, 654 F.3d 1104, 1124 (10th Cir. 2011) (citing *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir 2001) (internal quotation and further citation omitted)). "[P]robable cause 'is not a high bar.'" *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1220 (10th Cir. 2020) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "Officers need 'only the kind of fair probability on which reasonable and prudent people, not legal technicians, act.'" *Id.* (quoting *Kaley*, 571 U.S. at 338).

Where a warrant "is tainted by some unconstitutionally obtained information, [the court] nonetheless uphold[s] the warrant if there was probable cause absent that information." *United States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005); *see also United States v. Karo*, 468 U.S. 705, 721 (1984) ("after striking the facts about monitoring the beeper while it was in the [defendant's] residence, [the warrant affidavit] contained sufficient untainted information to furnish probable cause for the issuance of the search warrant").

i.      *Did the Trash Pull on January 29, 2019 Violate the Fourth Amendment?*

Mr. Nelson contends law enforcement officers violated his Fourth Amendment rights by searching his trash without a warrant.  Doc. 43 at 14.  And so, he reasons, the court can't consider the contents of the trash pull when determining whether the affidavit established probable cause for the search warrant to issue for the 19th Street Address.  *Id.*  Mr. Nelson reasons that the officers collecting the trash trespassed on his property to collect his trash and thus violated the Fourth Amendment's physical trespass test.  *Id.* at 10–11.  As discussed in the next subsection, without the trash pull evidence, Mr. Nelson argues the remaining evidence will not support a finding of probable cause.  *Id.*  The government responds that the officers did not physically trespass on the curtilage of Mr. Nelson's home when they retrieved the trash and Mr. Nelson held no reasonable expectation of privacy in his trash.  Doc. 35 at 13–14.

Controlling authority long has recognized that trash placed to discard has limited protections.  "A person has no reasonable expectation of privacy in discarded trash left on the curb for garbage collection."  *United States v. Jenkins*, 819 F. App'x 651, 654 n.7 (10th Cir. 2020) (upholding a trash pull executed by officers without a warrant) (citing *California v. Greenwood*, 486 U.S. 35, 40–41 (1988)).  "[H]aving deposited their garbage in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it, [defendants] could have no reasonable expectation of privacy in the inculpatory items that they discarded."  *Greenwood*, 486 U.S. at 40–41 (citations and internal quotations omitted).  "It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public."  *Id.* at 40.  In *Greenwood*, defendants had "placed their refuse at the curb for the express purpose of conveying it to a third party, the trash

12

collector, who might himself have sorted through [defendants'] trash or permitted others, such as the police, to do so." *Id.*

Thus, when deciding "whether an officer's conduct in taking garbage violates the Fourth Amendment, [the court] consider[s] whether the garbage bags 'were within the curtilage of the home,' and, if they are not, 'then no Fourth Amendment violation occurred.'" *United States v. Timley*, 338 F. App'x 782, 787 (10th Cir. 2009) (quoting *United States v. Long*, 176 F.3d 1304, 1307 (10th Cir. 1999)).  The leading cases define curtilage as "'the area to which extends the intimate activity associated with the sanctity of a . . . home and the privacies of life.'" *Id.* (quoting *Long*, 176 F.3d at 1308).  "Even if the garbage bags are within the curtilage of a home, [the Tenth Circuit has] held a defendant 'must still show that he had a reasonable expectation of privacy in the trash bags' at issue." *Id.* at 787–88 (quoting *Long*, 176 F.3d at 1308).  The Supreme Court has identified four factors controlling analysis of a home's curtilage.  They are:

1.  the proximity of the area claimed to be curtilage to the home,
2.  whether the area is included within an enclosure surrounding the home,
3.  the nature of the uses to which the area is put, and
4.  the steps taken by the resident to protect the area from observation by passers-bys.

*United States v. Dunn*, 480 U.S. 294, 301 (1987); *see also Rieck v. Jensen*, 651 F.3d 1188, 1193 (10th Cir. 2011) (applying the four *Dunn* factors to determine whether officers trespassed onto the curtilage of defendant's home).

During the evidentiary hearing, the government introduced video taken from a pole camera placed across the street from the 19th Street Address.  Also, the government introduced screenshots from that video.  Gov. Exs. 6–9.  This evidence established that someone had placed the bags of trash collected by the officers on the curb and on the edge of the lawn closest to the public street.  *See* Gov. Ex. 6.  They appeared ready for retrieval by normal trash pickup on trash

day.  *See id.*  This exhibit establishes that the number of trash bags stacked for removal extended

in the direction of the house.  *Id.*  But, none of them were adjacent to the house or any other

structure at the 19th Street Address.  *Id.*

After reviewing the video and photographic surveillance, the court concludes none of

*Dunn*'s factors favor a finding that the place where the trash was set for collection in front of the

19th Street Address qualifies as the home's curtilage.  The trash bags were placed as far from the

home as possible without placing them in the public street, no enclosure surrounded the area

where the trash bags were placed, the area is not an extension of the house situated on the

property, and the resident of the 19th Street Address took no steps to protect the area from

others.  *See id.*  Instead, the bags of trash were tied up and placed as near the curb as possible in a

manner manifesting an intent for trash collectors to collect the trash bags.  *Id.*  Indeed, Mr.

Nelson has presented no argument explaining how the trash bags were within the home's

curtilage such that he held a reasonable expectation of privacy in the trash bags or the property

on where they rested.

Mr. Nelson also argues the garbage itself constituted an "effect" in which he holds a

privacy interest.  Doc. 43 at 10–11.  But, Mr. Nelson never explains or cites any authority

justifying his assertion that garbage, sitting on the curb ready for trash collection, deserves such

protection.  *See id.*  Instead, Mr. Nelson cites cases finding Fourth Amendment protections apply

to searches of a person's house or effects in which they have a reasonable expectation of privacy.

For example, Fourth Amendment protections apply when the government physically occupies a

person's private property by placing a monitoring device on a car.  *United States v. Jones*, 565

U.S. 400, 404–05 (2012).  They also apply when officers invade the curtilage of a home—like

the front porch—where a privacy expectation exists.  *Florida v. Jardines*, 569 U.S. 1, 4–7

(2013); *see also Collins v. Virginia*, 138 S.Ct. 1663, 1668, 1670–75 (2018) (holding the partially enclosed portion of the driveway where a likely stolen motorcycle was covered by a tarp constituted curtilage in which a reasonable expectation of privacy existed).  But here, no evidence suggests that the officers physically trespassed on the curtilage of the 19th Street Address to search for information, nor has Mr. Nelson established a legally-recognized reasonable expectation of privacy in one's trash set out for collection, such that the trash bags constituted "effects" entitled to Fourth Amendment protections.  The court thus rejects Mr. Nelson's first argument that an illegal trespass produced the trash pull evidence collected by law enforcement officers.

ii.      *Did Probable Cause Exist for the Search Warrant?*

Mr. Nelson next argues that the affidavit submitted to the Wyandotte County District Court Judge failed to establish probable cause, and thus the court should exclude any evidence seized from the 19th Street Address when officers executed the state court search warrant there. Doc. 43 at 5.  Mr. Nelson's motion reviews each assertion in the affidavit separately and simply concludes that the affidavit failed to establish probable cause because each fact asserted either was obtained illegally or unreliably, or because the information on the whole doesn't suffice to establish probable cause.  *See id.* at 7–11.  Mr. Nelson's piece-by-piece analysis conflicts with the standard for a probable cause determination.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Id.*  The magistrate must also consider the "veracity" and "basis of knowledge" of the persons supplying hearsay information.  *Id.*  A reviewing court need only "ensure that the magistrate had a

substantial basis for concluding that probable cause existed." *Id.* at 238–39 (text alterations and internal citations omitted).  As explained below, taken as a whole, the affidavit's report of information provided by three individuals (two confidential informants and the subject of a traffic stop), the video evidence, and the fruits of the trash pull provided probable cause.

In Part II.i, the court concluded the trash pull did not violate Mr. Nelson's Fourth Amendment rights.  But, even if the court had concluded the challenged evidence collected from the trash outside the 19th Street Address should be excluded, the other assertions in the affidavit—setting aside the trash pull evidence—sufficiently support a finding of probable cause under the totality of the circumstances test.  *See Sims*, 428 F.3d at 954 ("When a warrant is tainted by some unconstitutionally obtained information, [the court] nonetheless uphold[s] the warrant if there was probable cause absent that information.").

Detective Blackman received information over the course of three months before applying for a search warrant for the 19th Street Address.  Specifically, in November 2018, a confidential informant identified "Pablo" in the North 19th Street and Wood Avenue area as a person trafficking in narcotics and firearms.  This CI personally witnessed this individual with a firearm outside his house.  Then, on November 8, 2018, KCKPD Narcotics Officers stopped Heather Bowles for failing to yield after she left the 19th Street Address.  During the traffic stop, officers searched Ms. Bowles's vehicle and found a syringe with what appeared to be heroin residue.  Ms. Bowles informed officers she could purchase heroin and methamphetamine from "Pablo" in the 19th Street and Wood Avenue area.  And, Ms. Bowles admitted to leaving Pablo's house shortly before officers stopped her.

And then, in early December 2018, CS #2 met with KCKPD Officer Passinese and DEA Agent Mansfield and informed them that Mr. Nelson sold heroin and methamphetamine in ounce

quantities.  CS #2 also told law enforcement officers that Mr. Nelson sold firearms and he lived at the 19th Street Address.  Officers planned a controlled buy with CS #2 but, ultimately, it fell through.  But, CS #2 received text messages and pictures from Mr. Nelson about possible firearm and heroin sales.

In mid-January 2019, the first CI notified law enforcement that he had seen Mr. Nelson with a large bag, believed to be methamphetamine, outside of the 19th Street Address.  After law enforcement received information from three different individuals—all identifying the same area, house, and individual—the KCKPD and DEA installed a pole camera across the street. During surveillance conducted on January 25, 2019, officers witnessed seven different vehicles arrive at the 19th Street Address during the day.  Their occupants interacted with occupants in the house at the 19th Street Address and none of the vehicles stayed longer than 20 minutes. Again, on January 28, 2019, officers witnessed two more vehicles arrive at the 19th Street Address only for those vehicles to arrive and depart within 10 minutes.  Based on his professional experience, Detective Blackman believed the high volume of traffic and short stays were consistent with narcotics sales.

Mr. Nelson argues that if the court excludes the trash pull then "the [c]ourt is left with three uncorroborated statements by confidential informants with no stated history of credibility, two days of surveillance with no observation of illegal activity, and one uncorroborated statement by Heather Bowles who was found in possession of heroin not obtained from Mr. Nelson or the house in question."  Doc. 43 at 14–15.  But characterizing Detective Blackman's affidavit in this manner is wrong, both factually and legally.  The affidavit specifies a series of interactions at the 19th Street Address that contributed to the issuing judge's analysis.

Mr. Nelson argues the court should disregard the CI, Ms. Bowles, and CS #2's statements as unreliable or insufficient to support a probable cause finding. *First*, he contends Detective Blackman's affidavit doesn't: (1) explain why the CI is trustworthy and his statements are reliable, or (2) explicitly state how Detective Blackman decided to focus on Mr. Nelson and the 19th Street Address based on the CI's statements about "Pablo" and a description of a house in the general area of 19th Street and Wood. Doc. 43 at 7–8. *Next*, Ms. Bowles identified "Pablo" selling narcotics in that area. But, because Ms. Bowles didn't possess any narcotics purchased from "Pablo" or from that 19th Street Address, Mr. Nelson contends that her statement doesn't reveal illegal activity by Mr. Nelson at the 19th Street Address. This, he argues, gave Detective Blackman no reason to use her statement to support the search warrant affidavit. *Id.* at 8. *Finally*, Mr. Nelson argues the affidavit doesn't explain whether the officers confirmed the phone number that CS #2 used to text about drug and firearm sales belonged to Mr. Nelson or how it was connected to the 19th Street Address. *Id.* at 8–9. In short, he asserts the affidavit doesn't show CS #2's statements are reliable. *Id.*

The court is unpersuaded by Mr. Nelson's arguments. That two individuals provided information identifying the 19th Street Address and illegal activity at that address supports a probable cause finding by the issuing judge. While each individual informant may not support a probable cause determination, the combination of their corroborating statements can. "Specifically, '[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the information.'" *United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)). "A tip from a second informant can also help corroborate information from a confidential informant." *Id.* at 1114 (citing *United States v. Sturmoski*, 971 F.2d 452,

455–56 (10th Cir. 1992)).  The CI notified Detective Blackman that someone inside a house in the area of North 19th Street and Wood Avenue sold narcotics and firearms and the CI "personally observed NELSON outside of his house while in possession of a firearm."  Gov. Ex. 1A at 1.  Heather Bowles, a woman seen leaving the 19th Street Address, interviewed with officers and asserted she could buy heroin from "Pablo" in the same area where the 19th Street Address was located and that she had just left "Pablo's" house before being stopped by officers. *Id.* at 1–2.  CS #2, an individual working for a different government agency and for a different agent, informed law enforcement that Mr. Nelson had sold methamphetamine, heroin, and firearms.  CS #2 informed officers Mr. Nelson lived at the 19th Street Address, *id.* at 2, in the same area described by the first informant.

Mr. Nelson also argues the police did not directly observe criminal activity at the 19th Street Address.  Doc. 43 at 9.  But, to establish probable cause, the controlling law doesn't require an officer to observe illegal conduct directly.  *See Artez*, 389 F.3d at 1113 ("The test is whether the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the *place to be searched*.") (quoting *United States v. Nolan*, 199 F.3d 1180, 1183 (10th Cir. 1999)).  Police officers observed and reported many vehicles come and go from the location after short stays there.  Gov. Ex. 1A at 2.  Law enforcement established a series of brief visits to the 19th Street Address over two days.  The facts of each interaction is similar.  A car arrived at the 19th Street Address.  An occupant of the vehicle went inside the house at the 19th Street Address, or, in two instances, interacted with a person just outside the residence.  A few minutes later—the duration of the visits varied, lasting as little as two minutes and as much as twenty minutes—the occupant of the vehicle departed the property and returned to their car.  Then, the car left.  This coming-and-going occurred at least

nine times over two days before the state court judge issued the warrant.  To no one's surprise, Detective Blackman's affidavit testified that short stay activity like this is "indicative [of] a house that sells narcotics."  Gov. Ex. 1A at 3.

Detective Blackman's testimony comports with similar conclusions by many courts. "Police surveillance which shows an unusually high volume of visitors briefly entering and leaving a residence, consistent with drug trafficking, can also corroborate information from a confidential informant that the residence is being used to distribute narcotics."  *Artez*, 389 F.3d at 1114 (quoting *United States v. Corral*, 970 F.2d 719, 727 (10th Cir. 1992) (internal quotations and text alterations omitted)).  For probable cause, "what is needed is that the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations."  *Id.* at 1115.  "[O]bservation that a series of visitors entered the residence and stayed for only a short period of time [does] provide some additional corroboration of [a] confidential informant's tip when interpreted in light of [the officer]'s extensive experience."  *Id.* at 1114.

Mr. Nelson's characterization of the facts available to the issuing judge simply misapprehends the governing legal standard.  His argument disaggregates the evidence and contends that no individual piece of evidence established criminal activity.  But here, the court finds that the affidavit as a whole—even if the trash pull evidence was eliminated—contained sufficient information to support the issuing judge's conclusion of probable cause of a potential crime at the 19th Street Address.  In short, the issuing judge "had a substantial basis for concluding that probable cause existed."  *Gates*, 462 U.S. at 238–39 (internal quotations and text alterations omitted).

In sum, three separate individuals had informed officers that an individual was selling narcotics in the 19th Street and Wood Avenue area.  Officers identified "Pablo" as the defendant here, Stephen Nelson.  Two confidential sources informed police officers that an individual had sold firearms and narcotics in the 19th Street and Wood Avenue area, Ms. Bowles informed police that she had just left "Pablo's" when she was stopped by police after leaving the 19th Street Address, and police surveillance revealed high traffic at the address, indicative of narcotics sales.  Detective Blackman's affidavit presented all this evidence to the state court judge who issued the search warrant.  The combination of the informants' corroborating statements and police surveillance supports a finding that the issuing judge had a substantial basis for concluding probable cause existed to search the 19th Street Address.  And, the trash pull evidence—which the court has concluded was legally obtained—provided even more support for the judge's probable cause finding.

### III.      Federal Rule of Criminal Procedure 41(b)

Next, Mr. Nelson argues Detective Blackman violated Rule 41(b) because the search of the 19th Street Address was "federal in character," and thus required the Detective to seek a search warrant from a federal magistrate judge.  Doc. 43 at 13.  The government responds that Rule 41 does not apply because Detective Blackman was a state officer requesting a warrant for evidence of state crimes, so, the search was state in character.  Rule 41 thus does not apply.  Doc. 47 at 3–7 (citing *United States v. Johnson*, 451 F.2d 1321 (4th Cir. 1971)).

> i.      *Does Rule 41 Apply to the Search of the 19th Street Address?*

Mr. Nelson argues the search of the 19th Street Address was "federal in character" because federal law enforcement officers were involved in the investigation and the resulting search.  Doc. 43 at 11–18.  So, he says, Rule 41 applies.  *Id.*  The government responds, arguing

Rule 41 doesn't apply as the search wasn't "federal in character" because Detective Blackman was a state officer and applied for a state search warrant to search for evidence of state crimes. Doc. 47 at 3 (citing *United States v. Johnson*, 451 F.2d 1321 (4th Cir. 1971)).

If a search "is federal in character" then the search must be conducted under a warrant that "satisfies constitutional requirements and certain provisions of Fed. R. Crim. P. 41 designed to protect the integrity of the federal courts or to govern the conduct of federal officers." *United States v. Pennington*, 635 F.2d 1387, 1389 (10th Cir. 1980) (citations and internal quotations omitted). Federal Rule of Criminal Procedure 41(b)(1) requires "[a]t the request of a federal law enforcement officer or an attorney for the government: (1) a magistrate judge with authority in the district—or if none is reasonably available, a judge of a state court of record in the district—has authority to issue a warrant to search for and seize a person or property located within the district[.]"

Rule 41 applies "only 'when federal officers are directly involved in carrying out the search itself and in taking immediate custody of the fruits of the search.'" *United States v. Pulliam*, 748 F.3d 967, 974 (10th Cir. 2014) (quoting *United States v. Bookout*, 810 F.2d 965, 967 (10th Cir. 1987)). "[O]r [it applies] 'if from the beginning it was assumed a federal prosecution would result.'" *Id.* (quoting *United States v. Barrett*, 496 F.3d 1079, 1091 (10th Cir. 2007)).

> [E]ven though [a] search is made pursuant to a state warrant, if the search is nonetheless 'federal in character,' then the legality of the search would be conditioned upon a finding that the warrant satisfied federal constitutional requirements and certain provisions of Fed. R. Crim. P. 41 'designed to protect the integrity of the federal courts or to govern the conduct of federal officers.'

*United States v. Millar*, 543 F.2d 1280, 1284 (10th Cir. 1976) (quoting *United States v. Sellers*, 483 F.2d 37, 43 (5th Cir. 1973), *cert. denied*, 417 U.S. 908 (1974)).

"'Generally, a warrant is not federal in character if no federal agents participated in obtaining the warrant or in conducting the search.'" *Barrett*, 496 F.3d at 1090 (quoting *United States v. Gobey*, 12 F.3d 964, 967 (10th Cir. 1993)).  The Tenth Circuit also has "suggested that a warrant will retain its 'state character' if there was only 'minimal . . . federal involvement . . . .'" *Id.* (quoting *Millar*, 543 F.2d at 1283).

In *Barrett*, the Tenth Circuit held there was only minimal federal involvement because "the warrant was requested by a state law enforcement officer, was issued by a state magistrate judge, and the original plan had been for only state law enforcement officers to execute the warrant." *Id.* at 1090–91.  The warrant retained its state character even though the DEA was asked to perform the search after a shooting and "[n]otwithstanding this involvement of DEA task force agents, there was no evidence that a federal prosecution was envisioned at the time of the search." *Id.* at 1091 (citing *United States v. Fort*, 478 F.3d 1099, 1106 (9th Cir. 2007)).

However, "[a] search is 'federal in character' when federal officers are directly involved in carrying out the search itself and in taking immediate custody of the fruits of the search." *Bookout*, 810 F.2d at 967 (first citing *United States v. Massey*, 687 F.2d 1348, 1355 (10th Cir. 1982); then citing *United States v. Rios*, 611 F.2d 1335, 1347 n.22 (10th Cir. 1979)).

In this case, Detective Blackman, a detective with a municipal police department— KCKPD—and also a Task Force Officer working with ATF applied for the search warrant for the 19th Street Address.  Gov. Ex. 1A at 1.  He sought a search warrant from a judge in the District Court of Wyandotte County, Kansas authorizing a search of the house at the 19th Street Address for evidence relevant to "the crime of Distribution and Possession of a Controlled Substance and Criminal Possession of a Firearm." *Id.*  Detective Blackman's affidavit includes information acquired from federal sources. *Id.*  A CI working with ATF notified "ATF Task

Force Officer Blackman" of suspected criminal activity in the 19th Street and Wood area. *Id.* CS #2 met with Special Agent Tyler Mansfield, of the DEA, and Detective Passinese, with the KCKPD. *Id.* at 2. This source claimed he could purchase drugs from Mr. Nelson and he had exchanged text messages with Mr. Nelson discussing heroin and firearm sales. *Id.* And, the trash pull conducted outside the 19th Street Address on January 29, 2019 included "Task Force Officers and agents for the ATF and DEA." *Id.* at 3.

Once the warrant was issued, ATF agents assisted in the search of the 19th Street Address, catalogued the collected evidence, and stored it with ATF. *See* Gov. Ex. 1B at 3–5 (listing ATF as "Recipient" of collected evidence). ATF Special Agent Elizabeth Gentry photographed the evidence and ATF Special Agent Misty Dye worked on the photo log of evidence. Def. Ex. 6. And, several KCKPD Special Operation members wrote in their incident reports that they had served the warrant on the 19th Street Address "for the ATF." Def. Ex. 7 ("We were at the residence to serve a search warrant for the ATF."); Def. Ex. 9 (KCKPD's Special Operations Unit "conducted a 'No Knock' search warrant at 1847 N. 19th St. for ATF and the Narcotics Unit."); Def. Ex. 10 ("I helped serve an ATF warrant at 1847 N 19th St."); Def. Ex. 11 (Special Operations Unit "executed a search warrant for the ATF at 1847 N. 19th St.").

The Tenth Circuit addressed facts similar to the ones presented here in *United States v. Rios* and held Rule 41 applied to the search warrant because of federal law enforcement officers' involvement. 611 F.2d at 1347. "Although the warrant was issued by a state judge, on a state form, on application of a state narcotics agent, and the search was apparently conducted by state agents, the federal DEA agent set up the transaction with the [defendants] and provided the state agents with essential information used in the affidavit for the warrant." *Id.* "Moreover, the DEA

agent was present when the state officers obtained the warrant from the state judge and subsequently took possession of the items that had been seized from the mobile home." *Id.* at 1347 n.22.  The Circuit concluded that, "[i]n view of the significant federal involvement in the incident, the affidavit must satisfy federal constitutional requirements and certain provisions of Fed. R. Crim. P. 41." *Id.* at 1347.

Similarly, here, Detective Blackman received information from federal sources, worked with federal law enforcement authorities and searched the 19th Street Address with ATF's assistance.  Given the degree of involvement by federal agents in the investigation and, later, in the actual search of the 19th Street Address, the court holds the search was "federal in character." Rule 41 applies here.

> ii.     *Did Applying for a Search Warrant from a State Court, Without Attempting to Obtain a Warrant from a Federal Magistrate, Violate Rule 41(b) in a Manner Requiring Suppression of the Evidence?*

Because the search was "federal in character," the court next must determine whether the search warrant violated Rule 41 in a fashion that requires the court to suppress the evidence secured through the search warrant.  Mr. Nelson argues that Detective Blackman violated Rule 41 because he first did not seek a warrant from a federal magistrate and, instead, went directly to a state court judge.  Doc. 43 at 11–18.  The government argues Detective Blackman did not violate Rule 41 because a federal prosecution was not envisioned when Detective Blackman applied for the search warrant.  *See* Doc. 47 at 4–5.  And, even if Rule 41 applies—which the court concludes it does, *see* Part III.i—the government argues that Mr. Nelson failed to prove prejudice or intentional and deliberate disregard of the rule.  *See* Doc. 47 at 8–11.  Thus, the government argues, even if Rule 41 was violated, the court need not suppress the evidence.  *Id.*

Rule 41(b)(1) defines the venue for a federal warrant application and states "[a]t the request of a federal law enforcement officer or an attorney for the government:  (1) a magistrate judge with authority in the district—or if none is reasonably available, a judge of a state court of record in the district—has authority to issue a warrant to search for and seize a person or property located within the district[.]"  Detective Blackman did not seek a search warrant from a federal magistrate judge.  Mr. Nelson asserts a federal magistrate was reasonably available when Detective Blackman applied for the search warrant and directs the record to three warrants signed by a federal magistrate from this district on January 29, 2019—the date when the state court issued its warrant for the 19th Street Address.  Doc. 43 at 14.

The Tenth Circuit has recognized "some violations of Rule 41 can lead to the suppression of evidence regardless of whether the search was reasonable under the Fourth Amendment." *Pulliam*, 748 F.3d at 973 (citing *Sims*, 428 F.3d at 955).  But, not all Rule 41 violations require the court to suppress evidence from a search.  Instead, "suppression is only warranted if the rule violation was (1) of constitutional magnitude; (2) prejudicial; or (3) intentional and deliberate." *United States v. Sadlowski*, 948 F.3d 1200, 1204 (10th Cir. 2020) (citing *United States v. Krueger*, 809 F.3d 1109, 1113–14 (10th Cir. 2015)).  "[T]o [secure] suppression for such a violation, [the Tenth Circuit] require[s] the defendant to show either (1) there was prejudice in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *Pulliam*, 748 F.3d at 973 (internal quotation marks omitted).

Mr. Nelson never argues the alleged violation of Rule 41(b) qualified as a constitutional violation.  *See* Doc. 43; Doc. 49.  Since Mr. Nelson does not make this argument, the court need not address this prong of the analysis.  The court considers prongs two and three, below.

> a. *Was there "prejudice," in the sense that no search would have occurred or the search would have been less abrasive if Rule 41 had been followed?*

Mr. Nelson argues seeking a search warrant from a state court judge, rather than a federal magistrate, constitutes prejudice because a state court judge lacked jurisdiction under Rule 41. Doc. 43 at 15–16. The government argues "there is no reason to believe a federal magistrate judge would not have issued a warrant on the same showing." Doc. 47 at 9.

The Tenth Circuit defined "prejudice," as it is used in this context, in *Krueger.* Rule 41 "prejudice" is "prejudice in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed." *Krueger*, 809 F.3d at 1115. "[I]nstead of focusing on what the Government *could have* done to comply with Rule 41(b)(1)," the Tenth Circuit explained "that prejudice in this context should be anchored to the facts as they actually occurred." *Id.* at 1116. *Krueger* also directs courts to ask whether the issuing judge could have followed Rule 41(b)(1). *See id.*

The issuing judge in *Krueger* lacked authority under Rule 41 because the warrant was to be executed on property situated outside of the federal magistrate judge's assigned judicial district. *Id.* at 1111. So, the warrant in *Krueger* "violated Rule 41(b)(1)'s within-district limitation on federal magistrate judges' warrant-issuing authority." *Id.* at 1114. As a result, the judge in *Krueger* could not have issued a search warrant for property outside the district and that judge thus could not have complied with Rule 41(b)(1). *See id.*

This case is more like *United States v. Pennington*, where a federal magistrate issued a search warrant to federal officers to search for evidence of federal crimes but state officials executed the warrant—thus violating Rule 41. 635 F.2d 1387, 1390 (citing *United States v. Burke*, 517 F.2d 377, 386 (2d Cir. 1975)). *Pennington* reasoned that "the defendants in the instant case did not show any real prejudice resulting from the fact that the warrant was executed

by state officials, without federal help."  *Id.* (first citing *United States v. Turner*, 558 F.2d 46, 52 (2d Cir. 1977); then citing *United States v. Dudek*, 530 F.2d 684, 688 (6th Cir. 1976)).  "In sum, the fact that the warrant was executed by a state officer, who was authorized under Oklahoma law to execute search warrants, and not by a federal official," did not justify invoking the exclusionary rule.  *Id.*

Mr. Nelson argues the state court judge who issued the search warrant to search the 19th Street Address lacked jurisdiction because a federal magistrate was reasonably available when Detective Blackman applied for the search warrant. Doc. 49 at 5–6.  But, here, Detective Blackman, a KCKPD Officer and TFO with ATF, applied for a search warrant from a Wyandotte County District Court Judge for a property located within Wyandotte County—the territory covered by that state court—to search for evidence of state law crimes.  Gov. Ex. 1A; *see State v. Robinson*, 363 P.3d 875, 959 (Kan. 2015) *disapproved on other grounds by State v. Cheever*, 402 P.3d 1126 (Kan. 2017) ("[Kan. Stat. Ann §§] 22-2502 and 22-2503 authorize judges of the district court to issue search warrants, but [Kan. Stat. Ann. §] 22-2503 places territorial limits on the execution of warrants issued by district magistrate judges.").  As discussed in Part III.i, federal agents were involved and certainly it was possible that the search might yield evidence of federal crimes.  But, unlike *Krueger*, the Wyandotte County District Court Judge held authority to issue a warrant for property situated in his county.  And, Rule 41(b)(1) anticipates such state court judges, under certain circumstances, will issue warrants to search for evidence of federal crimes.  In short, the facts as they actually occurred here resemble a technical deficiency rather than the kind of "gross negligence" present in *Krueger*.  809 F.3d at 1117.  Here, the warrant was secured from a state court judge where the search included both state and federal characteristics under circumstances where such judge—had a federal magistrate been unavailable—would have

possessed authority to issue the search warrant to search the 19th Street Address for evidence of state and federal crimes.

Mr. Nelson has failed to establish that the search would not have occurred if Rule 41(b) had been followed to the letter.  Nor does Mr. Nelson contend the search would have been less abrasive if Rule 41 had been followed.

   *b. Is there evidence that law enforcement officers intentionally and deliberately disregarded Rule 41?*

Mr. Nelson argues that seeking a state search warrant rather than a federal one constituted an "intentional or deliberate disregard" of Rule 41 because Detective Blackman testified he had concerns about "whether the evidence in his affidavit would rise to the level of a federal search warrant."  Doc. 49 at 7–8.  The government responds to this line of attack, arguing Detective Blackman "had concerns about the viability of federal charges prior to the search warrant's execution, [and] not about probable cause supporting the search warrant."  Doc. 50 at 2.

The court is unpersuaded by Mr. Nelson's argument that Detective Blackman intentionally disregarded Rule 41(b)'s requirements.  Detective Blackman sought a search warrant from a Wyandotte County, Kansas District Court Judge—the same county where the 19th Street Address is located.  When Detective Blackman sought the search warrant, he was investigating state law crimes identified as "Distribution and Possession of a Controlled Substance and Criminal Possession of a Firearm."  Gov. Ex. 1A at 1.  When Detective Blackman applied for the search warrant, it was unclear whether the prosecution would proceed in state or federal court.  But, after officers executed the search warrant, the District Attorney for Wyandotte County filed state charges against Mr. Nelson for criminal possession of a firearm. The balance of the evidence favors finding that law enforcement officers neither intentionally nor deliberately disregarded Rule 41.  The court finds that the officers did not do so.

### c. Conclusion

To conclude, the Rule 41 violation Mr. Nelson asserts here does not justify suppressing the evidence secured from the search under the warrant because the violation was not prejudicial and it was not intentional and deliberate.  *See Sadlowski*, 948 F.3d at 1204.

> ### iii. Does a Rule 41 Violation Warrant Suppressing the Fruits of a Search under the Leon Exception?

Even if the court were persuaded that law enforcement had violated Rule 41 in a manner that was prejudicial, intentional, and deliberate, or amounted to a constitutional violation, that conclusion alone would not mandate suppression of the evidence under that warrant.  Instead, in *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court established the principle that "the exclusionary rule does not apply in cases where 'the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment.'"  *United States v. Esquivel-Rios*, 786 F.3d 1299, 1306–07 (10th Cir. 2015) (quoting *Leon*, 468 U.S. at 918).  Our Circuit has explained *Leon* this way:  Assuming agents have committed a constitutional violation, "improperly obtained evidence remain[s] admissible when the executing agents act with an objectively reasonable good-faith belief that their conduct is lawful or when their conduct involves only simple, isolated negligence . . . ."  *United States v. Workman*, 863 F.3d 1313, 1317 (10th Cir. 2017).

Also, the Circuit has applied *Leon*'s exception to a Rule 41 violation where the Circuit assumed a federal magistrate judge in the Eastern District of Virginia issued a warrant that the magistrate lacked authority to issue.  *Id.*  The court assumed the judge's error made "the resulting search" unconstitutional "or a prejudicial violation of federal law or a federal rule."  *Id.* (citing *United States v. Potts*, 586 F.3d 823, 832 (10th Cir. 2009)).

To evaluate whether the *Leon* exception applies, the court must "consider whether a reasonably well-trained agent would have known that the warrant was invalid despite the magistrate judge's authorization." *Id.* at 1320 (citing *Leon*, 468 U.S. at 922 n.23). The court begins this analysis from the premise that the officer in question "acted in good-faith reliance upon the warrant." *Id.* (quoting *United States v. Campbell*, 603 F.3d 1218, 1225 (10th Cir. 2010)). Here, beginning from that premise, the court finds that the *Leon* exception applies to any Rule 41 violation committed by Detective Blackman. The evidence establishes that Detective Blackman made a good faith choice to apply for a warrant issued by a state court judge. Detective Blackman's affidavit disclosed that he was a TFO with ATF and a KCKPD officer, that he worked with federal confidential informants, and that he worked with federal agents when reviewing the trash pull evidence. Detective Blackman clearly laid out the federal involvement in this investigation to the issuing judge. And still, the issuing judge granted the search warrant.

Detective Blackman credibly testified that when he applied for the warrant on January 29, 2019, he was planning to pursue state law crimes. This testimony is credible because, among other things, Wyandotte County's District Attorney actually commenced a state court criminal case against Mr. Nelson, charging him with Criminal Possession of a Firearm. In short, Mr. Nelson first was charged with a crime in the very jurisdiction of the state court judge who issued the search warrant.

Also, Kansas state law authorized the Wyandotte County District Court Judge to issue a warrant authorizing a search within that judge's territorial jurisdiction. *See Robinson*, 363 P.3d at 959. Kansas City, Kansas is the principal city in Wyandotte County, Kansas and the house searched at 1847 N. 19th Street is located in Kansas City, Kansas. It was perfectly logical for

Detective Blackman to make his probable cause showing to a judge located there.  Finally, Detective Blackman's role as a KCKPD Officer and Task Force Officer with ATF led him to investigate possible violations of state as well as federal law.  He was, after all, a detective employed by the Kansas City, Kansas Police Department.

Together, these facts persuade the court to find that law enforcement reasonably believed and acted in good faith when they relied on the warrant issued by the state court judge.  Mr. Nelson has not even established "isolated negligence."  *See Workman*, 863 F.3d at 1317.  The court thus concludes that *Leon*'s exception applies here and thus saves the collected evidence from suppression even if a Rule 41 error was made.[3]

## IV.     Conclusion

The court finds the search warrant was supported by probable cause and the trash pull did not violate Mr. Nelson's Fourth Amendment rights.  Additionally, even if Rule 41(b) was violated, suppressing the evidence is not warranted for two reasons.  *First*, the Rule 41(b) violation wasn't prejudicial or intentional and deliberate.  *Second*, the *Leon* good faith exception applies.  The court thus denies Mr. Nelson's Amended Motion to Suppress Evidence (Doc. 43).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Amended Motion to Suppress Evidence (Doc. 43) is denied.

**IT IS SO ORDERED.**

**Dated this 29th day of October, 2020, at Kansas City, Kansas.**


                                                        **s/ Daniel D. Crabtree**
                                                        **Daniel D. Crabtree**
                                                        **United States District Judge**

---

[3]     The court understands that *Leon* recognizes five situations where it does not apply.  *See Workman*, 863 F.3d at 1317–18 (quoting *Leon*, 468 U.S. at 923 & n. 24).  Nothing suggests that any of those five situations apply here.